the judges pronounced their opinions, seriatim.
Judge Coalter.
The land, concerning which this controversy exists, was formerly a part of the Fall'r Plajitalion, belonging to the late Col. William Byrd, and lies on the south margin of James River, bounded hy that river on the north; and on the east, south, and west, by the lot attached to the fishery, the lots of the town of Manchester, which are laid off north of the forge, or mill canal, and by the said canal to its junction with the rive,r above. It joins no other lots of the town, except those above mentioned, being severed therefrom by the forge prize, or canal aforesaid, which lies between this land and the balance of the town. Previous to the establishment of Manchester, and that part of Richmond called Shockoe, the whole of the lands belonging to Byrd, on both sides of the river, had been conveyed, by him, to trustees, who were also his creditors, for the payment, as well of their own debts as what he owed to others, he being about to go to Europe. Those trustees made sales of considerable portions of the property conveyed to them, but so far from being paid their own debts, they were induced (particularly John Robinson) to make large advances to said Byrd\s other creditors, in his absence j *370 and, in the year 1770, the debt due to said Robinson's estate, amounted to about 20,000/. In the mean time, however, Byrd had returned to Virginia; and, in Au~ gust, 17G7, he, and his trustees, propose to lay off the towns of Manchester and Shockoe, and to dispose of the same by way of lottery, the scheme of which was then published. There were various improved tenements, fisheries, ferries, &c., which formed the large prizes and, amongst others, on the Manchester side, was a double forge, or mill, with two and a half acres of land adjoining ; the use of the landing ; the canal, with ten feet on each side ; and 2,000 acres of back land, estimated at C,000/. This lottery was to be drawn in June'h and, I presume, was so dratvn, as the act of Assemb-y, establishing the towns, passed in 1769. It is not pretended that the piece of land in controversy was recognised by the survey and plan of the town, or by the act of Assembly, either as a street or common, or as otherwise appurtenant thereto ; on the contrary, except where it joins a few lots laid off below what is now Mayo's Bridge, it is severed from the town by the forge prize, aforesaid, one of the largest in the lottery.
After these transactions, to wit, in May, 1770, Byrd, and' his surviving trustees, by deed, acknowledging the debt due to Robinson as aforesaid, convey to Edmund Pendleton and Peter Lyons, his surviving administrators, all that tract of land in Chesterfield, lying on James River, near the falls thereof, and all the other lands, tenements, lots, and messuages, lying in said county, and in the county of Henrico, belonging to said Byrd, or the trustees, and all the other lands and slaves comprised in the other deed to the first trustees, not before sold by them, or either of them, and which they have now a right, by virtue of said deed, to sell; (except the several prizes drawn by fortunate adventurers in the said lottery, &c.;) to be sold, first, to pay any debts or securityships due, or obligatory on the surviving trustees, then, the debt due their intestate, &c. The land in controversy, *371 iherefove, not being a prize drawn, nor a street belonging to the town, the fee remained in Byrd, and his trustees, and by this deed was passed to Pendleton and Lyons. The surviving trustees reserved the right of selling the premises, themselves, until the 10th oí December, 1770; after which, Pendleton and Lyons, if their debt was not then paid, were to have the right to proceed to sell, &c, to effect which, said Byrd was to give all assistance in his power. This deed was acknowledged on the day-of its date, by ail the parties thereto, and recorded in the general Court.
In the year 1774, Byrd, and two of his surviving trustees, in the first deed, for the consideration of 100/., to them in hand paid, conveyed to John Mayo, father of the appellant, '■ two lots in Manchester, and one in Richmond, and the whole land between the river and canal, including the river, with all privileges, &c. -which ever was vested in said Byrd, or his trustees, except such land as is laid off into lots, and disposed of by lottery, as by reference to the plan of the town, recorded in Chesterfield, will appear.”
This deed was acknowledged in May, 1774, in the general Court, by Byrd, and two of the surviving trustees, Carter and Turnbull,- the other two surviving trustees, though named in the body of the deed, not having signed it. In this deed, Byrd warrants against himself, his heirs, and assigns. Whether this money went to pay the debts still due to the surviving trustees, or that due Re-bins on's administrators, does not appear; but considering how difficult it had been to raise money to pay off those debts, and the probable magnitude of them, from the specimen of that due to Robinson, it is not likely that they had been all paid off in the short space of four years; much less that Robinson's also had been paid off. There is no reconveyance from Pendleton and Lyons; and, from, any thing that appears, the legal title is now in their heirs.
*372 The appellant (who claims under his father, the grantee, in the last-mentioned deed) instituted his ejectment against Murcliie, the appellee, as surviving trustee of the town of Manchester, who (instead of defending the suit at law, either by showing the legal title in another, or by showing that this land, as a street or common, had passed as appurtenant to the (own) filed his bill to stay proceedings in the ejectment -r alleging that Byrd, and his trustees, had appointed agents to superintend the laying off and bounding the town ; and that, in doing this, they set apart the “ slip of land which lies between fames River and the lots of said town, near what is now called Mayo's Bridge, as a part of said town, to be annexed thereto, and held by the inhabitants, as a common forever.” He admits it-is not described as a common in the plan of the townr and that there is no deed conveying it as such; but says, that neither are the streets described; in this, however, he is mistaken, as they are laid down in that plan, and the act of Assembly expressly recognises them, and enacts, that the town, as it is already laid out in lots' and streets, containing 312 lots, as by said plan and survey may appear, is established a town; had this land been so established, and annexed to the town as a common, the defence, at law; against any infringement of this right, would have been clear. The party, however, admitting that no legal title had passed, comes into a Court of equity for relief; and the defendant answers the bill, submitting also to the jurisdiction of that Court. The bill further alleges, that this slip of land is absolutely necessary to the said town, in order to enable the inhabitants to approach the river with facility ; and, without it, the communication between a great part of the town and the river, will be entirely cut off; u although, in the printed scheme of the lottery, public landings were promised them.” This printed scheme has been exhibited, by consent, to this Court; which, after designating the improved lots, and other high prizes on the Manchester side, states 300 unimproved lots, each half an acre, estl *373 ■Rated as worth 257. each, to be laid off in a town convenient to the river, with public landings. The scheme, as to the Richmond side, designates, amongst other prizes, 10 islands in trie river, on some of which are valuable fisheries ; and these islands are laid down and numbered In tbe plan of the town ; some of them nearer the Man-'heater shore than the Richmondand above what is now Mayo’s Bridge.
On these written and public documents, I incline to think the inhabitants of the town of Manchester have strong claims to the justice of this Court, which I aro willing to extend to them, as far as I can, in this action j and if, for defect of proper parties plaintiff, I could not, ultimately, decree in their favour, yet, as it is of great public consequence that this controversy should be speed» .Sly decided, I should think myself justified in intimating sny present impressions as to ¡heir rights, sending the cause back to have the bill amended, or such steps taken as finally to conclude the inhabitants by the decree to be made. Taking the case up, too., on these documents, would greatly relieve me as to the question whether there are proper parties defendants ; for the deeds, un» der which the appellant claims, having reference to the lottery, the plan of the town, &c. will, probably, make this scheme, as well as the plan, a muniment of title % against which he, or those under whom he claims, will not be intended to have purchased; and against which, Byrd, probably, will not be intended to have warranted. As to those lots which lie north of the canal, and adjoin ibis land, there being no street laid off in front of them, nor access to them, except through this land, the parties, not only from the scheme, which could not be intended to convey lots that should be inaccessible, but from the very nature of the conveyance itself, would be entitled to a street, or way, to their lots. So, also, as to the islands in the river, the very nature of the transaction implies that they shall be accessible from the main land. A street, therefore, from the main road, an well down a.; *374 up the river, so as conveniently to answer these purposes, would, I conceive, be demandarte, and might bé decreed by a Court of equity. So, also, as to public landings and ways to them ; they being, not only generally promised, but the use of the public landing expressly reserved as to the forge prize, now the appellant’s property. Had these things been provided for by those persons entrusted to lay off the town, no injury would have arisen to any party; but the scheme would have been fully carried into effect; and a Court of equity* considering that done which ought to have been done, might now designate and secure to the parties these rights, thus, as it at present appears to me, necessarily resulting from' their respective deeds and title papers. The purchasers of tickets paid their money under the faith-of the scheme advertised, and, as to every thing which can be fairly claimed under it, may be said to be purchasers for a valuable consideration ; as to every thing beyond this, the party relies on a parol contract, or, rather, declaration, made by the persons laying off the town, and, under this, he now claims the whole of this land as a common.
As to this point, I should feel little hesitation in dismissing the bill on the merits, so far as it claims any thing beyond what the parties may be entitled to under the written documents, were I satisfied that there were proper parties plaintifF before the court; and this, although I think there are not proper parties defendant, to this branch of the controversy, to enable me to decree against the appellant; for why keep the appellant in Court in order to give him the aid of, or the appellee a recourse against, other defendants, when no case is made out against him ? but as the appellee does not sue in his own fight, but in the right of others, if he does not legally represent those others, then a dismission of this bill would not bind the inhabitants of Manchester, whose rights ought not thus to be finally prejudged. Courts, however, will sometimes, in instances of this kind, in *375 amate their present impressions, in order to save litigasion, if the real parties cannot make a different or better case. This parol promise, or declaration, was either merely voluntary, and without consideration, or it super-added to the scheme, as published, an additional inducement, and did induce purchasers to advance their money for tickets. In the former case, being merely voluntary, It would not be good against a subsequent purchaser for valuable consideration ; in the second case, it would have vested an equitable right (if made by a person having a competent authority to bind Byrd and his trustees) in. the party thus induced to adventure, to have the easement promised. Let me here remark, though, that it is neither alleged, nor proved, that any one was thus induced to advance his money, or that this additional inducement was made public, or known to any purchaser of a ticket; on the contrary, it appears that Mr. Lyle, a conspicuous inhabitant of Manchester, knew nothing of It until long after the lottery was drawn, nor does it appear that a single ticket was sold after this declaration, .But take it, that an equitable right did vest in the holders of tickets who drew lots in Manchester, and has passed with the lots from purchaser to purchaser, and now exists in the holders of lots ; has this right to an action, or suit in equity, been transferred to the appellee 1 The act of Assembly establishing the town, appointed nine trustees, any five of whom might act, with power to regulate buildings, &c.; and, in case of vacancies, the surviving, or remaining trustees, were authorised to make new appointments.
The act of 1J78 empowers the trustees of Manchesier, and their successors, by that name, to sue and implead, either in the county or general Court, any person or persons who shall commit a trespass on the streets of raid town, or lands which may have been appropriated for the use of the inhabitants thereof, &c. “ Provided nothing herein contained, shall be construed to affect the legal rights of any person hplding lands adjoining tha *376 said town.” The vacancies have not been supplied, and there are no trustees, now, to supplj' them, the appellee alone surviving. The legal number competent to act, have ceased to exist, and the body politic, in fact, is dis~ solved, and must remain so until the legislature shall again bring it into existence. The appellee does not, therefore, legally represent the town, and, I apprehend, could not sue in those cases expressly mentioned in the statute; and, á fortiori, not in a case where I have doubts whether the whole could have sued. It does not follow that trespasses and nuisances in the streets cannot be redressed, or that the right in question, if it ever did exist, and vested in the trustees, is gone with the corporation ; those rights, and the proper remedies, still exist, unimpaired by the dissolution of that body, in the people ; m whom they originally vested, and to whom they belong ; and had they, or some of them, in their own right, united with the appellee in this suit, there would have been no objection with me as to the want of proper parties plaintiff in the cause.
Whether there are proper parties to a suit, or not, will not depend on the will or election of the suitors, who frequently go to trial (as in this instance) without objection as is evinced by all those cases where the Court themselves direct a cause to stand over for new parties to be made;(a) and they ought, generally, to be such, that the decree, if pronounced either way, will be obligatory on all parties interested and not only end the controversy pending, but avoid the danger of contradictory decrees, thereafter, between any persons interested in the pending controversy. It will sometimes happen, though, that a bill will properly be dismissed, although the necessary defendants are not made, or are not before the Court, so as to justify a decree for relief; as in the case of an injunction against the assignee of a bond, on the ground of a latent equity between the assignor and obligor before assignment; if the assignee can show that the equity has been waived or abandoned* as to him, he *377 will be dismissed ; because, this decree can never conflict with one that may be pronounced between the original parties. But if relief is to be had against the assignee, then the assignor must be a party, not only because he is the party conusant of the transaction, on which the equity is alleged to arise, and is, therefore, necessary to the defence, us well to confess, or deny, as to avoid it by after agreements, &c. but because he, if not before the Court, would not he bound by the decree, and,, on a subsequent suit by the assignee, would have the same right of defence that he could have urged had he been made a party to the first suit; and so there might be contradictory decrees as to the same matter of controversy. Moreover, the plaintiff may have a decree himself against the assignor. But, I believe, there is no case in which a Court has undertaken to decree against a defendant, merely because he has submitted to the jurisdiction of the Court, where, by the plaintiff’s own showing, it appears that he is neither the party interested, nor the legal representative of that party; and, although I may be mistaken as to the fact, yet this appears to me to be the case in the present instance. As to the merits of this parol agreement, unless the parties interested can hereafter make out a better case than that which has now been made for them, my impressions are, that they cannot succeed under it. Take all the depositions in the cause, there is no proof, to me, of any authority in Cary and others, to stipulate or promise any thing more than, the scheme would give to the parties ; indeed, the bill itself does not allege any special authority to this effect, but merely a general authority to lay off and bound the town.
The sale to Lyle, it is true, was cancelled; but Byrd% in the fall, or winter, after, expressed his surprise th'.i' there should be any doubt as to his right to sell this land; and he did sell a part of it to Trent, as early as 1769, whose right remains undisputed; and, it is strange, as this claim was thus disputed prior to the passage of the *378 act establishing t.he town, that this land was not designated, in that act, as a common, or otherwise belonging to the town ; on the contrary, although the parties knew of the sale to Trent, and of the deed to Mayo, in 1774, and of his exercising acts of ownership on the ground, and of the appellants doing the same, by abutting thereon his bridge, spoken of in the bill, and laid down in the plat, that they should have permitted these rights, depending on parol proof to have slept until nearly all the parties to this alleged contract were dead. But the evidence, in this case, is much weakened, if we reject the depositions of the inhabitants, of Manchester, the real plaintiffs in this controversy, as it is said. Two of these depositions, to wit, of Weiseger and Quarles, are said to be taken by consent j but, I presume, that consent was merely intended to obviate objections as to want of commission, or notice, or something of that kind, and not to waive an objection to the coinpetency of the witnesses, because they are interrogated as to their interest, which is also proved by another witness, and can surely be no waiver of objections to others. I think all the holders of lots in Manchester are incompetent witnesses j that their depositions are properly objected to, and ought not to have been admitted in this case. But, it appears to me, that the parties claim, in this Court, beyond what was either contemplated in their bill, or in the decree of the Court below. In order to extend the claim to the ■whole land between the river and the canal, we must construe that part of the bill, claiming the land adjoining the town lots, to mean the lots south of the canal, and so include the whole canal, at least, above the bridge, with the ten feet on each side ; or, otherwise, we must restrict it to those lots which it really does'adjoin, and thus leave the land above the bridge unclaimed. It is readily admitted, that there never could have been any foundation to claim the canal and twenty feet of land as a common, or street, it being phrt of the large prize. But it is said, a bill may claim too pauch, and this is no objection to *379 ■decree what is right. Can we, however, suppose that the bill intended so extraordinary a claim ? and if it was so understood in the Court below, why did that Court decree a conveyance of all the appellant’s right to the land so claimed, and thereby take from him, not only the land between the canal and the river, but his mill canal, with twenty feet of land, and vest the whole in the appellee in fee, for the benefit of the town, not to be held by them as a common ? This extent of claim was certainly not contemplated by the bill, either as to quantity of land, er estate.
Public landings were promised by the scheme. This is noticed in the bill. The highest possible public land* ing is some distance below the bridge, as is proved. There are lots near the bridge, joining this land, which (as before observed) have no street to them. The demands in the bill, then, (without putting so forced a construction upon it as that above supposed,) can be well defined, as extending to the land beloxv the hridge. a rFhey declared and set apart, the slip of land which lies between James River and the lots of the said town, near what is now called Mayo's Bridge, as part of said townf &c. These lots lie near Mayo's Bridge; the ground, stated in the bill to have been sold to Lyle, lies down here ; the public landings are here, which are the great object of an approach to the river, and which cannot be approached through the land above the bridge, unless the eanal, and twenty feet of ground, can be also thrown open as a common. If, therefore, I could decree in favour of the plaintiif, on this parol agreement, I could not extend his claim beyond what it appears to me to be clearly stated in his bill, although the testimony might carry me further; the party, if he wished to go further, would have to amend his bill. But this claim appears to be of a shifting nature in another respect. The bill claims a common. In argument, we are told that Mayo has the fee, and that a decree to convey all his interest, is right; in other words, that (instead ef an incorporeal heredita *380 ment, a right of common, or to ay, which can only exist as growing out of that fee remaining in another) the plaintiff is to have the fee, for the use of the inhabitants of the town, as tenants in common ; or, if Mure hie is not the plaintiff, but this suit is really by the inhabitants, (as was also contended for,) that, then, instead of a right of Common, they are to have the fee. If they are to have the fee, or are to be cestui que trusts of the fee, as tenants in common, the property will no longer be attached to the lots, as a street, way, or common, forever to be kept as such, agreeably to the statement in the bill; bur each tenant in common may dispose of his interest, and it may, finally, become vested in one man, who, having the fee, may sell or use it as he pleases. The decree., therefore, which directs Mayo to convey all his interest in the land, I think, is erroneous. A decree ought to be a regular consequence from the case stated and proved. If, as is contended, Byrd and his trustees agreed to vest in the inhabitants a right of common in the land, the fee remained in them, subject to this easement. This fee, with any right they held in the bed of the river, they could continue to ho!l, or fell and convey, and the Court, I apprehend, could not compel them, or their alienee, to convey this fee to the commoners. It is of no consequence in whom the fee is, if the incorporeal hereditament, growing out of it, is secured to the party claiming it, it may as well remáis in Mayo as not,* and the bill rlaimintf no more, the u-cree ought not to have gone further.
But did I tKink there -,va proper pirty plaintiff, and that a parol agreement, founded on valuabh •f ederation, definite as to its object, and the quantity of estate to be conveyed, was proved, and that this suit, to set it up, had b, • . executed vkL’u reasonable time, still I should not be able to decree against the defendant in this case; because, I think, necessary defendants are wanting, in order to authorize such decree. There is no proof that the original trustees, who held the fee, accona *381 jjanLfl with a beneficial interest, were parties to this parol agreement, or that fhey were ever informed of it during their lives. They conveyed the fee to Pendleton and Lyons, (in whom it i:; not alleged there was notice of this claim,) first, for the discharge of their own debts; snd, second, for h r aysnent of a large debt due the intestate of those grun.ees ; and in them, or their heirs, the fee, probably, yet remains ; aknough they, or some of them, may have received the purchase money from the ancestor of the appellant, in whom, also, no notice is proved ; for, though he was bound to take notice of the scheme, and other written documents, yet, under them alone, notice of the claim to the present extent cannot be inferred, as this is a claim beyond the written testimony; and, even if he knew of the present claim, he would be protected against it by the ignorance of those parties, and so they are necessary parties, not only as probably holding the fee, but for th.e purposes of a just defence.(a) But, above all, Byrd, who warrants against his assigns, and under whom the appellee claims by virtue of this prior contract, being the alleged party to that contract, can alone defend against it — .can alone confess, deny, or avoid it; and, not only for that purpose, but being ic sponsible even under bis warranty, would not be bound by this decree, hut might show, in a suit brought against him by Mayo, a complete defence as to the merits of this case, so as to produce a contradictory decree; and, therefore, on every principle, I think, his representatives should be parties.(b) ulus appears to me to be according to the course, of the Court. In Hoover v. Donnally and others, 3 H. & M. 316., the plaintiff, as assignee of a purchaser from Donnally, files his bill against him and Grattan, a subsequent purchaser, to have a conveyance agreeably to thq first sale. Donnally confesses the first sale, but says, the purchaser being unable to pay, gave up the contract, See. and had this been proved, it surely, would have been a good defence. This case was reversed in part, because the first purchaser was not a d/s *382 fendaní, to confess or deny the sale of his right to the plaintiff; so, in Argenbright v. Campbell, 3 H. & M. 144., Campbell, the elder, under whom both parties claim» ed, was made a defendant. In the case of Lewis v. Madison's heirs, 1 Munf. 303., Rowland Madison's heirs were not parties. But as the Court were clearly of opinion, that the heirs of the first purchaser had no equity against Lewis, the second purchaser, and that the bill, as to him, ought to have been dismissed; this question was not decided, although two Judges give it as their then impressions, that a decree could not have been pronounced against Lewis, without those parties. This suit is an injunction on the ground of an existing prior equity in the plaintiff, arising under a contract, or agreement, of the parties under whom the appellant claims ; those persons, or their representatives, appear to me to be necessary parties.
On the whole, I am, at present, of opinion, that the inhabitants of Manchester have, under their .deeds and written documents, certain rights, which a Court of equity may secure to them ; but that they have no claim, under the parol agreement, which that Court can enforce. With this intimation of opinion, given for the sake of speedy justice, but without intending it to be obligatory, as to either point, on the parties, on either side, who, when properly convented, will be at liberty to make, or defend their case, as shall be advised, I am for reversing the decree, and sending the cause back to the Chancery Court, with liberty to the plaintiff (who, as surviving trustee, would, perhaps, not improperly unite„ as plaintiff, with the inhabitants of Manchester, or some of them, and, for the purposes of speedy justice, I am, in this case, willing, so far to recognise him as such, as not to dismiss the bill altogether) to amend the bill and make new parties, that the cause may be proceeded in to a fin,al decree.
*383 Judge Roane,
This is a bill brought by the appellee, as surviving trustee of the town of Manchester, on behalf, and for the benefit, of the said town and its inhabiiants, against the appellant and William Nelson, the agent of Charles Carter, who was the surviving trustee of WilHam Byrd. It prays, on the ground of an equitable title, alleged to exist in his and their favour, in and to a slip of land, the subject of controversy, and for which they have never obtained a deed, or other legal title; and on the further ground of the appellant’s having brought an ejectment against the appellee as surviving trustee aforesaid, for the said land, to which he claims the legal title by virtue of a deed from the said William Byrd, and two of his trustees, (Charles Carter, the surviving trustee, not having joined therein;) that the said appellant may be enjoined from proceeding in the said ejectment; that lie and the said Charles Carter, by his agent aforesaid, may be decreed to convey the said land to the appellee, as surviving trustee aforesaid; that the said appellee, for and on behalf of the said town and its inhabitants, may be decreed to be quieted in the possession thereof; and for further relief»
On a hearing of the cause, by consent of parties, as to the appellant Mayo, the Court of Chancery decreed, that he should release all his right, title, and interest, in and to the land in the bill mentioned, to the appellee, and his successors, trustees of the town of Manchester for the use of the said town; that the said town be quieted in the possession thereof, and that the appellant, Mayo, be perpetually enjoined from commencing or prosecuting any action at common lav/, for recovering the same.
With respect to the said Charles Carter, or his agent •aforesaid, the appellant, Mayo, having procured the legal title as to him also, prior to the hearing of the cause, by the decree in the proceedings mentioned, no decree was made, or was deemed necessary to be made, in this cause, as to that party.
*384 From this decree of the Court of Chancery Mayo appealed to this Court.
Before I go inf' the merits of the case, I will briefly notice such preliminary objections, made or occurring in the cause, as appear to me to deserve an answer.
In the first place, it has been objected, that the demand in the bill does not extend to all the slip of land lying between the canal and the river, but only to so much thereof as lies immediately between the lots laid off on ¡he north side of the canal and the river. Without ad- . *•. ting, at present, to the uniform tenor of the decisions of this court, which, in favour of substance, have exploded a rigid and technical construction of bills and proceedings in equity, I may here remark, that this tract is demanded as a slip of land, and no* as u part of that slip; that, in fact, the whole of that .lip does lie between the lots aforesaid and the riv >\ r.aigh a part of it, indeed, lies in a diagonal direct 1; it while the continuity of th" sl:n *s , . • i .!v construction now contended for, it >>uuid b the appellant to assign any precise limit by whit , ..... land, admitted by mVh .o n'~-. .J[)(,7-.-L"r '-'i1arly bounded. It is not shown that the present road to Mayo's bridge in fact existed at the commencement of the present controversy : and both that road, and the road to the former ferry, (the only other plausible boundary which can be resorted to under this hypothesis,) would leave so small a part of the slip, as the object contended for by this bill, as neither to answer the avowed object for which the appropriation for the use of the town was made, nor to be worth the trouble and expense of the controversy. Either of these boundaries would throw the land, admitted to have been appropriated for the use of the town, to the extreme corner thereof, in exclusion of other land-lying breast wise with the bulk of the said town, and emphatically convenient thereto; and in point of quantity would whittle it do wn to a spot, of no account whatever as to the purpose intended.
*385 it is «ext objected that three of the most important witnesses, on behalf of the appellee, are incompetent, and that their testimony ought to be excluded, by reason of their being inhabitants of, and landholders in, the town of Manchester, and therefore interested in the question in controversy. While the legality of this objection is not denied, as an abstract proposition, I am strongly inclined to think that the appellant has precluded himself from making the objection, as to two of them (fuarles and Weiseger) in the case before us. The depositions, of those witnesses, together with those of Goode and Taiman were taken on .the 14th September, 1805, in the-city of Richmond. They were taken by two magistrates, and the same two. While these depositions were all taken at the same time, by a competent number of justices, and by the same justices, it is not shown or alleged that there was any want of a commission, or of due notice to the adverse party, of the time and place of taking them: on the contrary, from the circumstance of its being stated that Goodens deposition was taken “ agreea-. My to notice,” and yet, also, that it was sworn to in “ the. presence and by consent of the parties,” that consent cannot, as to this deposition, be referred to the want of notice : nor, consequently, is it reasonable to refer it to the, want of notice, in relation to the two depositions in question ; especially, as there is another ground on which to apply and account for it, viz. the ground of interest» When, therefore, in these two depositions it is expressly stated in the introductory part thereof, that they were taken “ by consent of parties,” and, again, when (after they had been interrogated as to their interest) the magistrates also certify that these depositions were sworn to “ by consent of parties,” and no other defect is shown or presumed to exist, to be cured by this consent of parties, must it not be irresistibly inferred to relate to the objection of interest, and to waive it ? to waive it, at least, as to the reception of the testimony, however thg circumstances disclosed on the subject might still weigh *386 as to their credibility P This construction could not admit-of a possible doubt, were not this consent also extended to the depositions of Goode and Taiman, who are not also shown to be interested but as to them, this phrase may have been kept up through inattention; or there may also have been some supposed objections existing against them, also,' at the time which (like the interest of the Other witnesses) this consent was deemed necessary to-cure, and which, on account of the agreement of the parties to waive the same, have not been brought forward for the consideration of the Court. Under all these circumstances, to object to the reception of these depositions altogether, (and that in the appellate Court,) Would seem to be a departure from the principles of good faith and fair dealing, (as, but for this stratagem, the same facts might have been proved by other, and unexceptionable witnesses,) and is an objection, of which, consequently, the appellant ought not to be permitted to avail himself. I shall, therefore, consider the depositions of the said Quarles and Weiseger, as legal and competent evidence in this cause ; and as strengthening and fortifying- that construction, which irresistibly results from the other testimony existing in the cause.
I come now to consider the merits of this case ; and f am clearly of opinion that the appellees have an equitable title to the premises in question, by having purchased and occupied the same prior to the purchase by the appellant’s ancestor; and that that ancestor had notice thereof at the time of his purchase, both by reason of the general reputation which existed as to this purchase and possession, and of the inferences, to that effect, which he must unavoidably have drawn, from the situation and position of the land itself, taken in connexion with the plan of the town, the scheme thereof published by the trustees, and the various acts of assembly passed upon the subject: the appellant had also express notice of the title aforesaid, gprior to the consummation of his title by *387 the decree in the proceedings mentioned,) by the very exhibition of the bill before us.
With respect to the purchase of the premises from the trustees, (throwing the testimony pf Lyle out of the question, as being an inhabitant of Manchester, and whose deposition is not brought into the cause by consent, as are those of Quarles and Wciseger, and who proves unequivocally the authority of Cary,) it is proved by Col. Goode that Messrs', Patterson & Watkins were authorized by Byrd, and Ms trustees, on account of their dispersed situation, to lay off the town, and to advise with Colonel Cary, should any difficulties arise, who (Cary) was “ fully authorized” to act upon the subject; and that the slip of land now in question was set apart for a street or common for the town, by his direction, by the parties aforesaid. It is again emphatically stated by said Goode, that he knew “ that the said Cary was fully authorized by Byrd, and his trustees,” to act for them in laying off the town aforesaid; the force of which affirmation is not at all impaired by that part oí the testimony of said Goodet given on his cross-examination, which refers to two letters therein specified, as conferring the authority; for the witness, also, says, that these letters, “ with other, papers, then produced,” were found to confer an ample authority. This sale, and the agency of Cary, is also recognised and admitted by Byrd, who is proved, by Patterson, to have revoked a sale of a lot to Lyle, (a part of the premises in question,) on the ground of its being previously disposed of, on being informed thereof, and. remonstrated with on the subject. The appropriation of this slip to the use of the town, is also proved by Moore, a chain carrier, at the time of laying off the town; and io corroborated by the possession thereof, proved to have existed in favour of the town, from a date coeval with the transaction itself; the only exceptions to which are the equivocal acts of possession proved, on the part of Mayo, by the witness, Taiman, and which were not of a character to require the corrective, interference of the. *388 trustees ,of the town. With respect to that possession, while it is proved to have existed in favour of the town, prjor t0 the date of Mayo’s deed, it is objected, on itis part, that there were no such decisive marks of the actual occupancy of the town as were competent to give him notice thereof. In answer to this objection it may be replied, 1st. That their possession was of a character equal to that of his possession! for while a solitary act of building a vessel thereupon, is proved, on his part, by a single witness, who, also, declares, in a sweeping clause, that similar acts of ownership were always (not, I presume, before the date of his deed) exercised thereupon by the said Mayo, it is also inferrable that the inhabitants of the town vwho, it is proved, “ occupied” the same) manifested that occupancy by acts of as high a a dignity, for example, by grazing their cattle thereupon, pnd taking stone and turf from the premises: and, 2d. It may .be replied, that these were the only marks of possession that could be exhibited, in relation to a street or common: it would not have beep lawful to haye erected houses upon the same, or the like.
But that general reputation, which existed as to all others, in relation to a transaction so public and notorious as the laying off a town, and the enjoyment of its commons by the inhabitants, Mr. Mayo was also bound to notice. While that reputation is proved to have been general, and known to several witnesses, it is not shown that a single person was ignorant thereof; for, although it is shown that Lyle purchased a part of the premises parly in the next year, it is not further shown that he purchased it under an ignorance of the rights of the town. He might, Ipr any thing appearing in this record, have purchased, as Tient did, with a full knowledge of this claim, and running the risk of the title : he might have ■Ventured to have even bought a bad title, as Mayo himself is proved by Goode to haye done, in the general estimation of the people. With respect to Byrd himself, it jjy no means follows .that he sold Lyle’s lot under an *389 ignorance of the title of the town ; for he himself sold the same land, five years afterwards, to Mayo., after he had been warned in the transaction with X/yle, that the land sold was the land oh the inhabitants of Manchester.
I may therefore say, with perfect confidence, that here Was a general reputation, without a single exception to the contrary, of the right and the possession of the town, which could have arisen only from the public and notorious acts before mentioned, and which, coming to the knowledge of every body else, must certainly have been known to the elder Mr. Mayo at the time of his purchase. That inference is carried beyond the possibility of a doubt, by the internal evidence inherent in, and resulting from, the nature of the property in question, considered in relation to its actual situation, and to the public terms under which the town aforesaid was offered to the consideration of the adventurers.
It was decided in the case of Wilcox v. Calloway,(a) that the purchaser of a legal title is to be affected by any latent equity, of which he has either actual notice, or which appears in some deed, or (I will add) document, necessary to the deduction of the title, so as to amount to constructive notice. Under this position, abundantly supported by ail the authorities, the plan of the town of Manchester was brought before the eyes of Mayo; for it is particularly referred to in his deed; he having purchased all the land therein described, with the exception of “ such latid as is laid off into lots and disposed of by lottery.” His deed having also referred to the lottery, under which the town was disposed of, the public scheme ©f that lottery is also a document of which he was bound to take notice. To this 1 will add, as an undeniable position, that he was bound to notice the act of the legislature which established the town aforesaid. He is bound by such act, if not on the ground that acts of this character are bound up with the public acts of every session, and promulgated by the authority of the legislature, at least on. the ground that his deed refers to the totvn of *390 Manchester, as ascertaining the position and boundaries' of the lots of land thereby conveyed, the extent of which, town could only be known by recurring to the act establishing it, and the plan of the town laid off conformably thereto. I will go further, and add, that every purchaser is bound to take notice of a right or claim inherently and necessarily affecting the subject purchased. For example, if I purchase a tract of land surrounding another tract, contained in the centre thereof, I am bound to know that the owner of the land comprehended has a right,of way through the land l have purchased : and if I purchase a tract of land (as in the case before us) abutted by a square, or number of lots in a town, having no other street or way of communication with the other parts of the town or the adjacent country, I am bound to know that the inhabitants of such lots have a right to a street (not a mere right of way) over the land I have so purchased. These are things of which a purchaser must take notice at his peril, unless we are at liberty to consider him ignorant of the plainest principles of right and justice.
By these several principles and positions, let the purchase of the present appellant be tested.
In the case before us, Mr. Mayo\ with the very plan of the town before his eyes, which his deed refers to, and calls for, as a part of itself, purchased a slip of land extending up to the very hnes of the range of lots laid off below the canal, the owners of which have no possible way to pass, in the direction of the other part of the town, the public ferry, and the river, but through the slip aforesaid ; that slip of land being, on an inspection of the map, in several places, perhaps, not wider than the other streets of the town, and in none materially wider. Is it possible that he could have been ignorant (independently of all other information) of the right of the people to a street on the premises, and which, in one point at least, just between the aforesaid range of lots and the ferry, is so narrow, as, by extending to the riyer, would, perhaps, *391 divide the slip of land into two parts? Again, with the same plan before his eyes, which laid off the town down to the mill canal, and extending up the river to the mouth thereof, and also haying before him the scheme of the lottery, which promised to the adventurers that the lots should be laid off convenient to the rrosr, and with pubiic xaxdimgs, could Mr. Mayo possibly have supposed, that this bit of land was withheld from the town, which intercepted a communication with the river, at all points, Nut one, (the public ferry,! and which rendered ¡hat part of the scheme which promised the public landings, a mere delusion ? If it be said that public landings on this part of the river were unimportant, as the river at that place was not then navigable, the answers are twofold: 1st. That the pretensions of the appellant equally occlude such landings, at any other place convenient to the town, or, more particularly, in the space comprehended be» tween the head and the mouth of the canal, although the navigation, below the ferry, was not interrupted by rocks ; and, 2dly. That, although such was the then state of the navigation of the river, above the ferry, the same scheme held up the most Battering expectations of removing the obstructions through the falls within a short time, and extending the navigation of the river to au immense distance into the interior of the country, in which event public landings, even at that place, would have been all important.
Again, with the same documents before his eyes, as also the act of assembly of 1769, establishing the town of Manchester, which act established the said town, “ ia the manner it is already laid off into lots and streets agreeably to a survey thereof by B. Watkins,n which is particularly referred to by the act, ought not the said Mayo to have examined that survey J* and had he done so, Í expect, from the testimony exhibited in this cause,, (for the survey itself is not before us,) it would have, thereby appeared, that the land in question was set apart 3? the t»sft of the tqvn« These are damning documents,, *392 against which Mr. Mayo, at the time of his purdrasfe, could not possibly have winked so hard as not to see that the right in.question, or some right in the premises, existed in favour of the inhabitants of Manchester, and in consideration of which the adventurers and purchasers of lots in the said town paid a higher price for their property. It was the knowledge of this title existing in the town, also, which induced Mayo to offer, and Byrd to accept, for this slip of land, a price, perhaps, not one twentieth of its value, had the title been good; which' induced Mayo, for this trifling consideration, to purchase “ a bad titlef hoping that time and chance might render it good, and to accept a deed not containing a warranty therefor. The purchase was, therefore, with full notice of the title of the town, and mala fide; which is entirely strengthened by the length of time during which the appellant forebore to assert his claim; during which time a multitude of witnesses may have died, and docu-ments been lost, all tending to corroborate the testimony, even now sufficiently strong in favour of the appellee’s title.* I will ask, more particularly, how it has come to pass, that when the act of 1778, to enlarge the powers tíf the trustees of the town of Manchester, had made it the duty of the trustees to bring suits against all such as were committing trespasses on the ■“ streets of said town, or lands which may hdve been appropriated to the use of the inhabitants thereof,” (a description emphatically applicable to the premises in question,) and had directed *393 the money, to be recovered in such suits, to be applied In “ repairing the streets, or erecting wharves and improving the public landings within thb same,” why did not the ancestor of the appellant take the alarm for 1-tH lepa! title, and. contest, by a jiuttcbJ investigation this legishiiit e judgment, (if I may no express myself,) which had decidía? the right to the premises to be in the town, by legalizing the erection of wharves, and the improvement of public landings in and upon the same f as, certainly, no other part of the contiguous land would have admitted of wharves or landings. Where, then, was his redoubtable, though solitary witness, Ta man, who proves acts of possession, on the premises, six years afterwards, as equivocal, and as little satisfactory, as is the title which such acts of occupancy were intended to bolster up or consummate? In all probability, Taiman$ and such witnesses as he, would have been, at that time, frowned into annihilation by a horde of respectable witnesses, now consigned to the grave by the lapse of thirty ar forty years.
But if Mr. Mayo could be supposed not to have had notice of the appellee’s claim, at the time of his purchases why did he not stop his hand from proceeding and perfecting bis deed, after the said claim was made known to him by means of the law aforesaid, founded, no doubt, upon the petition of the people of Manchester ? why did lie even proceed to perfect his said deed by a suit in Chancery, against the surviving trustee of Byrd, after he had notice of the said claim by the institution of this very suit ? In the aforesaid case of Wilcox v. Calloway, it ira held, that a purchaser, in a case like the present, must be. a complete purchaser, by having a conveyance and having paid the purchase money, before notice ; for if he have notice before either of these acts be perfected, he ought to atop until the equity be inquired into, or he will be bound by it. The same doctrine is held in Mitford, 216., and many other authorities; and Milford, adds, that, in a plea of this kind, if the deed purports an immediate transfer, *394 (as in the ease before us,) it must also aver that the seller was in possession - of the premises ; because (I presume) the want of possession is, prima facie, an indicium of the want of title, and calculated, at least, to put the purchaser upon an inquiry. This possession, as existing at the time of his purchase, in Byrd, or his trustees, the appellant has not thought proper to aver, and, if averred, would have been disproved by the whole current of the testimony. I will here add, that not only did the appellant h/mself consider his deed incomplete up to, and after, the institution of the present suit, (as is evinced by his proceeding in equity to perfect it,) but that he was also correct herein ; for we are told in I Harr. 256,, (old edition, (a) that trustees have all equal powers, and v w , , cannot act separately, but must all join, both m convey- • anees and receipts.
I have thus examined this case by circumstances, and, Criteria dehors, the deed under which the appellant claims. The conclusion resulting therefrom is entirely confirmed by the internal evidence contained in the deed itself; for whik the grantor, Byrd, had thus a second time sold this ¡and, which, in equity, belonged to the appellees, and sold it (in the second instance, at least) with a full knowledge of that fact, he only warrants the title against himself, his heirs and assigns. A warranty, so contrary to the usual course which prevails, in relation to bona fide purchasers for full and valuable consideration, in itself creates a suspicion. These clausules inconsuetce, taken in relation to a bona fide purchase for full value, and without notice, not only create a violent suspicion that such is not, in fact, the character of the purchase before us, but are entirely accounted for by the very inadequate price given for the land in question, to be presently particularly noticed. As to the two trustees (out of four') who joined Byrd in this deed, and who are proved to have been in the habit of adding their names to deeds executed by him, without any further inquiry ; while this feet would go far, in a Court of equity, to affect any *395 deeds in which they have so joined, and especially such as are also impeachable on other grounds-, it is to be observed, that they have not joined in the warranty contained in this deed, even in relation to themselves, although they are included in the conveying part. Such a deed, accepted by a man who could not be ignorant that the title to the land in question had been originally conveyed to them by Byrd, and who, except as to the claim of the appellees, (I here keep the deed to Robin-eon*s administrators out of question,) were the true owners, carries with it internal evidence of the weakness of a title, which, at that time, would not stand the test of scrutiny, however available it might afterwards become, against an agreement existing only by parol, through the lapse of time, and the death of witnesses. That title is also impugned by the circumstance disclosed by the deed itself, that not more than, perhaps, one twentieth part of the value of the land, at the time of the purchase, was given for it. I infer this, because, although the exact,, quantity of the land in controversy has not been ascertained, yet, as fourteen lots (exclusively of streets) were substituted for it, on the back of the town, and each of these lots had sold for a sum equal to that given for this whole slip of land, (for three fourths of the hundred pounds, the consideration of the deed, went to pay for the three lots thereby also conveyed,) it follows, that, estimating this tract at only ten acres, and that each half acre here is only worth as much as the half acre lots in the interior of the town, (which is certainly far below the mark, in relation to these water lots,) not more than one twentieth of the value of this land, at the outside, was given for it. While this great inadequacy of price, singly and abstractedly taken, might be insufficient to vacate the contract altogether, it goes far, indeed, to show, that the extent of that contract is not such as the appellant now contends for. That inadequacy proves the full knowledge of Mayo and of Byrd, that the latter did not sell, nor the former acquire, the indefeasible right to the *396 premises in question; but that, on the contrary, Byrd'stitle only (such as it was) was conveyed for this paltry consideration. ' It proves, in the language of Colonel Goode, as applied to the general understanding of the neighbourhood, that Mayo ,only purchased “ a bad titled' To have made out his case, the appellant should have proved Colonel Byrd to have been so great a fool, as to have sold twenty of his water lots for the price given for one of the frontier lots of the town ; for, perhaps, less than a fortieth part of their real value. But this gentleman was no fool, although (hut for his known character for probity and honour) he might deserve a harsher epithet for.selling a lawsuit to Mr. Mayo, under the name of land, after he was informed, by the transaction with Lyle, that he had no land at the place in question.
Such is the inference irresistibly resulting from these circumstances, considering the value of the land in controversy as only equal to that of the adjacent land. But if we could, for a moment, embark into the regions of fiction, with one of the appellant’s counsel, and consider this land as worth the enormous sum of five hundred, thousand dollars, such a palpable and glaring inadequacy of price would be presented to the view of the Court, (even making all due allowances for its intermediate rise ■in value,) that all men must at once exclaim, “ this thing is not right j” all men must admit that this paltry sum of 25/. was only given for the mere right to sue for this immensely valuable property ; trusting that time and chance might perfect the title.
As to the merits of this case, therefore, I cannot have a scintilla of doubt; that the appellees are entitled to recover.
Notwithstanding, however, the strength of these merits in favour of the appellees $ notwithstanding that these merits are susceptible of various additional views, all tending to show the utter iniquity of the appellant’s pretensions, we are now told, that, after the appellees have run this long race, at the instance of the appellant. *397 and is* the very character with which he was pleased to clothe them, another chance must be given the appellant, by sending the cause back for want of parties. This is an objection which, as to the counsel for the appellant, has been, probably,'produced by the queries propounded from the bench. Ir» the former argument of this case, while it was asserted by the appellant’s counsel, on the one hand, that a decision upon the merits was desirable, It was not pretended, on the other, that there were not proper parties plaintiff in the cause ; and it was expressly admitted, that if (as the fact is) the legal title were in the appellant, Maye, the objection would not lie for want of parties defendant. While this Court is certainly not to be bound, by the omission of counsel, to state the real grounds on which any cause ought to be decided, It is not very likely that, in a case in which equal talents and industry have been displayed by the able counsel who argued it, points, so substantially material to their success, would have been omitted. The omission of these counsel, therefore, to take this objection, spontaneously, and in the first instance, iá a circumstance which goes to corroborate my opinion upon the question.
As to this objection of the want of parties, it amounts to an objection to the Court’s decreeing, at all, in that stage of the cause, on account of the absence of parties necessary to enable the Court to proceed, according to the principles by which it is governed. If the party defendant stands merely neutral, the Court is bound to seft that all necessary parties are brought before it ; but if he prays the Court to decree in that stage, or consents that it should so decree, it amounts to a waiver of the objection. In the case before us, it is true, the appellant neither prayed the Court to decree, nor consented, toildem verbis, that it should decree; but he consented that the cause should be heard as to himself, which amounts to the same thing. The Courts of justice are not to be so trifled with, as to be invited to hear causes without being suffered t© decide them. A esnsent, therefore *398 that the Court should hear a cause, amounts to a cor.sear that it should decree therein ; and a consent that the Court should decree in the case, wholly abandons the objection arising from the want of parties. This objection was not only, in fact, waived, but also might have been well waived by the appellant, in the case before us; for he had the whole title in himself, and was competent to a complete defence -j it was not until that title was found to be against him, on the merits, that this objection was started, or thought of.
On this broad principle, then, I am clearly of opinion, that the objection does not lie in the case before us. I am willing, however, to consider that objection more particularly, and under the idea that it had not been thus waived and abandoned on the part of the appellant.
It is now objected, in the first place, that there are not the proper parties plaintiff in the cause. That party, it is true, is only John Murchie ; but it is expressly shown that he does not sue merely for himself, and in his private character. This is shown by its being stated in the bill, and admitted in the answer, and other proceedings, that he sues as surviving trustee, and for the benefit of the town of Manchester. In the case of his wishing to appropriate the proceeds of the recovery to his own use, therefore, he would be forever estopped from such pretension, as well by such proceedings, as by the decree in this cause, which, pursuing the character of the claim set out in the bill, decrees (beneficially, at least) only in favour of the town of Manchester. Nor does it follow that, in the case of the appellant’s success in this instance, the inhabitants of the town could disclaim Murchie's agency, and harass him with a new suit hereafter. If, however, it were even so, the appellant possessed full power to subject himself to that inconvenience, by the 'Shape and character of his proceedings. In the event of a future suit brought by them, many circumstances might be urged by Mayo, tending to show that Murchie was their authorized agent, (admitting that, on general *399 principles, he was incompetent,) and that, with a lull knowledge of all circumstances, they acquiesced in his assuming that character, and carrying on the suit. While it is entirely admitted, that all persons concerned in the demand, made by a bill in equity, ought to be parties plaintiff, with the exception of cases in which they are very numerous, and the like; there is no rule or principle which prohibits the defendant, where such parties are, really represented, from dispensing with the strictness of form, or with objections of a merely legal character, in deducing the character of the representative. There may be a difference between the total absence of parties, for want of whom the Court of equity is disabled from its favourite object of doing complete justice in one suit, and cases in which there is a mere defect in the power of the agent, to which the adverse party, desirous, perhaps., of a speedy decision, is content to abandon his objection. This distinction derives abundant support from those principles of the Courts of equity, by which some, of many numerous parties, are permitted to sue ; those under the influence of which that Court even supplies and appoints trustees, or guardians, for the purpose of suing, and the like; and which disregard form, for the purpose of dispensing substantial equity to those beneficially in - terested. However the case might be, in the present m-stance, had the appellant stood merely still, or objected in an earlier stage of the cause, he has estopped himself fey the course taken by him in his proceeding. He has worked such estoppel, by bringing an ejectment against Murchie, as surviving trustee of the town of Manchester, of which ejectment, the present suit may be considered as merely a continuation in another forum; by recognising him as such trustee, not only by that suit, but by his answer in the present; and by consenting that the cause should be then '• heardf (as is before said,) as to Mayo, which term, “ heard,” was undoubtedly intended to mean a trial upon the merits, as contradistinguished from the dilatory exception for want of parties, I con *400 sider all these acts, and those, too, in relation to parties who are in fact, though, possibly, irregularly, represented, as amounting to a waiver of the objection on the part of the appellant. But for such waiver, the appellee, (if his authority were otherwise defective) might have set the objection at defiance, by showing a private act of Assembly, a written power by the inhabitants of Manchester, or the like, giving him full and complete authority.. Under circumstances like the present, the Court will presume any and every thing tending to show that the waiver was not made without due consideration, and that, if it had not been made, every objection to the appellee’s competency could, in the Court below, have been easily obviated. This view of the subject precludes the necessity of considering how far the appellee would have been authorized to maintain the suit, on general principles, or by virtue of the acts of 1769 and 1779 or either of them. It goes on the principle, that it is unfair and unjust for a party to decoy another, by false signals, into the appellate Court, where the objection cannot be obviated; that it is competent for a party to release a right intended for his benefit; that it is not competent to a Court to decree against the consent and admissions of both parties ; and that, in this case, no inroad is made upon the jurisdiction of the Court of equity, as all parties necessary to a complete decree, are, in fact, (though, possibly, irregularly so,) before the Court.
It is, in the next place, contended, that there are not the proper parties defendant in this case: and this objection is branched out to extend to Byrd’s trustees, or their representatives, and to Lyons and Pendleton, or those representing them under the deed of 1770. As to Byrd’s heirs, against whom he warrants by the deed to Mayo, the objection is not, I believe, extended to them: if those heirs should be construed to be bound, under the warranty in the deed, by an alienation made by Byrd’s authority many years before, yet, Byrd, having before parted with the legal title to his trustees, and, as it *401 contended, to Pendleton and Lyonss they are not necessary parties to this suit, unless the Court is prepared to ■say that you are to hunt through all the intermediate alienors up to the original owner of the land, and that he, or his heirs, are indispensable parties. With respect to the representatives of those from whom the appellant purchased ihe mill and canal, they need not be before the Court, untier the actual opinion of the Court, as I understand it, which only gives to the appellees the land up to the canal aforesaid. There will be nothing in this decree by which those parties can be possibly affected.
As to the necessity of making Byrd's trustees parties, the appellee certainly wants no decree against them,: they have parted with the legal title to the appellant; even Carter, who, at the time of the institution of thirs suit, had the remnant of that title abiding in him, was deprived of the same, by the decree in the proceedings mentioned, which was prior in date to the decree now appealed from. Byrd’s deed to Mayo, which, at law, wan objectionable for want of Carter's signature, has been freed from that objection by the decree aforesaid* The appellant was, thereafter, possessed of the complete legal title, and the appellees are in quest of it. On general principles, it would seem, that those who have, and those who want, the entire subject of controversy, would be proper and sufficient parties. It is enough that all those should be parties defendant to the suit, who possess all the rights in controversy in that suit, and therefore ean enable the Court of equity to make a complete decree upon the subject. It is not necessary that all those should be also parties, who will be necessary parties in other suits, to which the decision in the suit in question may give rise, by reason of a warranty, or otherwise.. That would lead to a never-ending line of parties, would Carry you up through all the mesne alienations to the Original owner, and impose upon the plaintiff, without necessity, the burthen of comprehending parties who are to him unknown, and perfect strangers. It is a grear *402 matter gained to the jurisdiction of Courts of equity, to settle the controversy, and avoid circuity, as to all inte» rested, in the very question in contest in the suit; that is, (as applied to this case,) as to all possessing or claiming the legal title. There are sufficient difficulties and delays already existing under this rule, and arising from the number of parties indispensably necessary. There is no need to go further to outgo the demand in the bill, and essay the vain attempt to settle by one decision, all other suits, and every consequential claim or injury, which may grow out of the decision of the point in issue. It is a consequence of these principles, that no person need be a party to a suit in equity, against whom if brought to a hearing, there can, or need be, no decree; although he be interested.(a) On this principle, it is tjjat a resi¿uaiy legatee need not be a party; nor need a bankrupt in a .suit against his representatives; though they are both much interested in reducing the amount of the sum demanded. Again, it is said not to be necessary to make the assignor of a bond a party, in a suit against the assignee impeaching the same, although he is interested in the consequence of the suit, by virtue of his assignment. All these parties are as evidently interested, as the trustees in this case would be if they had warranted the appellant’s legal title. In that < ase they would be evidently interested in defeating the plaintiff in this suit; for they would thereby defeat t e appellant’s remedy over, against themselves, for retribution. In principle, there is no difference between the cases: between the case of the residuary legatees, bankrupt, and assignor aforesaid, and that of vendors warranting the legal title. The contingent, liability of the party warranting, to be affected in another suit, is therefore no ground on which he should be held a necessary party in the. suit in question. This suit, as to its whole extent, may be decided without entering at all into the question of that liability: that question is to be discussed in another suit, in which the person warranting is a party, and in which it is to be *403 decided, whether in fact he warranted, or is liable to retribution, or not. The general principle, dispensing with such parties in the case of an actual warranty, will, however, be much strengthened, if, in the suit before us, it appears that no such warranty was made; and that, in fact, no liability to make retribution exists in favour of the appellant. That circumstance cuts up thE pretension by the roots, if, otherwise, it applied to the case before us. If this contingent interest does not entitle the person warranting to become a party for his own sake, far less will it for the sake of his alienee, the defendant, who stands in the preferable situation of having his immediate recourse over, against him, in case of eviction. Although, in the case of a warranty, the party warranting is eventually interested, no decree can, in a suit like the present, be made against him. Such decree cannot be made in favour of the plaintiff, because he goes for the land ; for the legal title, which the person warranting has not, but his alienee has; and he (the plaintiff; has no right to the money ; for which only, in case of eviction, the warrantor is liable. Nor can a decree be made against him in favour of the defendant; 1st. Because no decree can be made in favour of one defendant against another; and, 2dly. Because, then, there would be two decrees in the same cause ; one in favour of the plaintiff, for the land, and another in favour of the defendant, for the money; whereas, the most that Courts of Equity have aspired to, was, to settle the whole claim demanded in the bill by one decree. If, then, there can be no de« crce, against the party warranting, either for the plaintiff or defendant, he need not be before the Court, on the only ground on which such parties are held necessary, namely, to avoid circuity of action. In that case, this circuity ^though for another and distinct cause of action) must be encountered; for you can only come at him by another and a separate suit.
There is another principle on which, in favour of a party defendant, persons are sometimes held to be necea • *404 sary parties, who would not otherwise be so considered; and that is the principle of affording aid to the title set up by such defendant. Thus it was held in the case of Lowther v. Carlton.(a) that, in a suit against a purchaser with notice, from a purchaser without notice, the former is entitled to have the aid of the latter, to enable him to defend his title. In the case before us, however, (admitting that the trustees had warranted the title of the appellant,} they have no such shield, which would enure to cover him from the present claim. They had before conveyed the equitable title to the appellees, (which drew the legal title with it, except as against a purchaser without notice,) and had also parted with the legal title itself, before the decree in question was rendered. There was nothing, therefore, abiding in them, which might aid the title of the defendant ; but if this case had a common principle with that of Lowther v. Carlton, (in which, too, the objection, of the want of parties, was taken by the defendant,) it will be seen that the Court adopted the principle in that case, by analogy to the cases of aid-prayer at the common law. In those cases, the tenant for life, for example, is allowed to pray in aid him in the reversion. The Court, by resorting to that analogy, seems to have admitted that this was a privilege in favour of the defendant, which he might claim >n the one hand, or waive on the other; and it is probable that he would be even considered as waiving it by not claiming it. The Court considered it as ground of defence incident to the case of the particular defendant, and of which he only had knowledge, and was competent to claim or relinquish: they did not consider it as an ingredient of the jurisdiction of the Court of equity, and which, for the purpose of avoiding circuity, should be had, whether demanded or not, on the part of the defendant. While the ground of claim I am now considering is, in this case, widely different from that existing in the case of Lowther v. Carlton; as, in this case, the vendor has no shield which would be competent to de? *405 fcnd and protect the rights of the vendee as aforesaid; the cases are similar as to the character of the pretension, which I have just mentioned. The pretension, in this case, as in that, would be only a privilege in favour of the defendant: it is not a sine qua non of the jurisdiction of the Court, without which no complete decree could be rendered in the cause: a complete decree may be made against him who has the complete legal title. There is this further difference between the cases, that, while, in that case, the aid of the vendor was in fact prayed, in this it was disclaimed. It was renounced on the pari of the defiendan; ; if not by not praying it, at least by the various .¡ositive acts of disclaimer already mentioned. It was not until the appellant saw the prospect of being defeated on those merits, which he had challenged, or invited the appellees to try, single and alone on his part, that he took this ground of objection ; or, rather, it was then taken for him; and that in the appellate Court, in which it is not practicable for the appellees i.o obviate the objection.
These views of this subject preclude the necessity of examining the decisions of this Court, on the subject of parties. Whatever dicta, or doubts, m y be found to exist therein, there is cert; inly no positive and solemn decision in conflict with these principles. It seems to have been the fashion in this Court, without always knowing why, or wherefore, to object, in suits in equity, for want of parties. The ignes fatui arising out of this prolific subject of parties, have sometimes served to bewilder and mislead the Court; but, I believe, that this is the first time in which the subject has been fully and fairly met by this tribunal. I shall be happy if, in the decision now to be given, such criteria shall be established by the Court, as will bring all future questions of the kind to the proper test; and render these sightless and floundering objections less fashionable.
The foregoing remarks go upon the admission, that ihe trustees of Byrd had, in fact, given the appellant a *406 warranty, in the deed they made him, which would ena» ble him to recover over, against them, in case of eviction. That, however, is far from being the case. That warranty is not only entirely wanting, but the deed carries the most ample proofs upon its face, that no such warranty was intended. In addition to the enormous inadequacy of price before spoken of, and which is in utter hostility with the idea of passing a complete title, the omission of a clause of warranty, as to the trustees, while one exists as to Byrd, and his heirs, is decisive that none was intended as to the former ; on the principle that “ expressio unius est exclusio alterius.” Again, that deed only disposing of the lots and land thereby embraced, with the exception “ of such land as is laid off into lots and disposed of by lottery,” it may well be doubted (especially when it is found that the deed to Pendleton and Lyons has a similar exception) whether this l.md passed thereby, it having, in fact, been disposed of by lottery, as an appendage to the lots, and for which, consequently, the purchasers gave an enhanced price. The deed, therefore, relied on by the appellant, to show the necessity of these parties, is a complete felo de se in this particular ; it not only leaves it doubtful, to say the least, whether this land passed thereby, but shows, beyond a possibility of doubt, that no warranty was by them made or intended.
As to Pendleton and Lyons, and those representing them, under the deed of 1770, they have nothing to do with the present controversy. Their right, if any, will remain wholly unaffected by the present decision. However (as it at. present appears) their right may be considered as being prior toy and intercepting, the legal right of the appellant, it cannot affect that of the appellees, it being posterior to the equitable contract, which is the ground of their claim. It neither lies in the mouth of the appellant to object the want of a party under whom he does not claim, nor to impose it upon the appellees to engage in another and distinct subject of controversy. *407 it is no reason why the plaintiff should be delayed, or retarded, in his claim against the present appellant, that he shows another to be entitled, which also shows that he himself has no title. The object of praying in aid is to protect the title of the defendant* — not to defeat that of the plaintiff. The deed of Pendleton and Lyons cannot affect this claim . if that deed be taken to be still in existence, and unsatisfied,) for another reason, namely, that it did not pass nor affect this land, it only passes to those grantees, such lands as were not a before sold” hy the trustees, “ and as they now” (in i 770) “ have a right to sell,” under the original deed from Byrd to them. This land having been, however, before sold to the Jobholders as aforesaid, or, at least, it being land which, in 1770, the trustees had not “ a right to sell.” in conse - quence of the contract which is the ground of this bill, it did not pass by the said deed. The exception, in the deed, immediately following the foregoing passages of “ the prizes drawn by the fortunate adventurers in the lottery,” cannot narrow the effect of those passages, seas to pass the land in controversy by that deed ; 1st, Because a deed is to be so consí rued as to reconcile and give effect to all the material expressions thereof 5 and, 2dly. Because this land might, on a. liberal construction, to be considered as a part of those ££ prizes,” and, therefore, as exempted from the operation of this passage also. This deed, of k 770, therefore, has nothing to do with this land ; and, if it had, the appellant has not shown that he has derived any right under it. If it be said that the appellant should be protected, on the ground of being a purchaser from Pendleton and Lyons, who it is also alleged were purchasers without notice of the appellees’ title ; it is answered, that he not only did not purchase from them, but, also, that all and every of the notorious acts before relied on to convict Mayo of being a purchaser, with notice, from Byrd's trustees, would, equally apply to Pendleton and I.yons; and, indeed, perhaps, more so, as their purchase was mote recent, aftev *408 the contract and circumstances aforesaid had their ex* istence, than the purchase by Mayo.
Upon the whole, while I am of opinion that there was never a just ground of objection for want of parties defendant to this cause, and, however the objection, as to the party plaintiff, may be, on general principles, I am clearly of opinion that that objection ought not to be available under the circumstances existing in this cause. We ought not to suffer the appellee to be entrapped by this objection, after the appellant has elected to go to trial on the merits, and those merits are found to be against him.
I am of opinion, therefore, that the decree is right in the main; but it is erroneous so far as it invades the appellant's right to the ten feet of land lying along the canal. As to that extent, I am of opinion, that the de» cree should be reversed, and in all other things affirmed.
Judge Fleming.
This being a cause of much expectation and great interest to the contending parties, and having been argued with great ability, on both sides, the Court bestowed on it peculiar attention and deliberation 5 though much of what I had to remark on the subject, especially, respecting the capacity of the appellee to sue¿ and the want of parties (the only points on which I ever doubted) has been anticipated, and ably discussed by my brother Roane. I shall, therefore, confine myself principally to the merits of the cause; and, there being a division in the Court, shall, as the ground of my own opinion, take the liberty of briefly stating the origin, foundation, and establishment of the town of Manchester s' (where there was previously a public warehouse, for the inspection of tobacco, cdled Rocky Ridge, a few traders and other settlers in the vicinage;) and, notwithstanding the jurisdiction of a Court of equity, in the case, was vehemently denied by Mr. Williams, proceed to decide the cause purely on equitable principles; premising, that the appellee, after stating in his bill the *409 ground of his equity, proceeded to charge, “ that John Mayo hath commenced an action of ejectment at common law against him, (John Murckie,) as trustee of the said town, in the Richmond district Court, and threatens to obtain judgment, and to turn your orator, and the said inhabitants, out of possession, notwithstanding this equitable title aforesaidand prays relief. To the above charge the appellant answered, “ that, in consequence of the said bill and suit of the complainant, this defendant lias suspended the p osccution of his ejectment, and has obtained a decree in this’ Court against the said trustees,” (meaning Eyd’s trustees,) “to which, and the. pioceedings therein, this defendant refers $ in order that the -whole of this controversy may be EitiAULY heard in this Court.” To this answer the plaintiif replied generally ; and thus were the parties, by mutual consent, fairly at issue, on the equitab'e merits of the cause. It was urg. d however, in the argument, that “ consent cannot give a Court jurisdictions^ True, the maxim is correct, but applies not to the case before us; which needed nO consent to give jurisdiction tó a Court of equity 5 a Court of equity being the only proper tribunal for the hearing and decision of the cause ; and a party may, undoubtedly, by consent, waive every advantage that might be taken of error in form of the proceedings, in a Court of competent jurisdiction, and rely altogether on the merits of his cause; which is precisely what was done in the present case, if there be any such error in the record; and the party shall be stopped, and concluded by his own consent, so solemnly and deliberately stated, and sworn to, in his answer : and error in form only was stated, and objected to by one of his ingenious and learned counsel.
Let us now inquire in whose favour the equity of the ease preponderates.
The late Colonel William Byrd, a gentleman of great influence in the country, as well from his rank as ®he *410 immensity of his fortune, distinguished and esteemed alsé for his strict honour and great liberality, claimed and obtained the entire confidence of his fellow subjects; and being proprietor of the soil where the town of Manchester stands, and of a large tract of country around, on both sides of James River, and wishing to raise a sum of money, proposed to dispose of a great portion of that estate by way of lottery, and to establish a town on each side of the river; and, in order to enhance the value of the lots, and encourage adventurers, he, in the month of July, 17(57, published the scheme of his lottery in th& public newspapers; in which he stated, that the advantageous situation of the estate was too well known to require a particular description, though it might be necessary to inform the public that the obstructions through the falls, and in other parts of the river, might be removed, and the river made navigable to the said towns -, “ the navigation (said he) thereby will be extended and made bqfh safe and easy for upwards of two hundred miles above the said falls, and a communication opened to the western frontier of the middle colonies; whereby there will be not more than sixty or seventy miles portage from James River to the Ohio ; so that the immense treasure of that valuable country must necessarily be brought to market to one or other of the said towns j which will occasionally raise the rents, and enhance the value of the lands and tenements, under, mentioned, beyond the power of conception.”
In designating the prizes on the south side of the river, lie stated the first prize to consist of a double forge mill, valued at £8,000
With two acres and a half of land adjoining, and 2,000 acres of the back land; the use i.f the landing, the canal, with ten feet on each side, &c.
And (after noticing twelve lots already improved) headed “ lots unimproved, each, half an acre, to be laid off in a town con *411 lienient to die river, with public landings: number of lots 300, at 25 pound each.” £7,500
“ Tickets to be had of the trustees, named above, also of Colonel Archibald Cary, John Ilayles, and of the subscriber. Signed, WILLIAM BYRD ”
From the encouragement and allurements thus held out to the public, the tickets met with a rapid sale ; and the greater part of them having been disposed of, the lottery was drawn the ensuing summer. I purchased four of the tickets, hut they all having turned up blanks, I have no further interest therein. In the mean lime, Mr. Benjamin Watkins surveyor of Chesterjield county, a gentleman well skilled in his office, and of undoubted integrity, was employed, by the agents of Colouel Byrd, to lay off the town, agreeably to the terms held out by the scheme of the lottery: the events and circumstances which took place on that occasion have been detailed in sundry depositions filed in the record, have been sufficiently commented upon, and need not be recapitulated.
In the year 1769, an act of assembly passed <s for establishing towns at Rocky Ridge,” is'e. and, after a long -preamble, it was enacted, “ that the said first mentioned piece of land, lying and being at the falls of James River, on the south side thereof, be, and the same is hereby, constituted, appointed, erected, and established u town, in the manner it is already laid out into lots and streets, agreeable to a plan and survey thereof, made by Benjamin Watkins, surveyor of Chesterjie d county aforesaid, containing the number of three hundred and twelve lots, as by the said plan and survey, relation "being thereto had. rnay fully and at larye appear ; and shall be called and known by the name of Manchester
When we cast our eyes on the plan and survey of the town referred to in the act of assembly, it appears to extend upwards of half a mile parallel with the river ; between which, and the canal mentioned in the proceedings, lies the narrow slip of land now the subject of controversy 5 which, Colonel Byrd, m the year i Y7é¡ sold to *412 the father of the appellant, for about 25 pounds; notwilft' standing the same was, by the surveyor, when he laid off the town, specifically reserved for the general use and benefit of the proprietors and inhabitants thereof; for doing which, he was authorized by his employers; (as appears by sundry depositions in the record;) and Was also, as such, ratified and confirmed by the aforesaid act of assembly, in the year 1769; and whether it was called a street, a common, a way, an easement, or was distinguished by any other name, seems to me quite immaterial ; as, I conceive, the fortunate adventurers in the lottery, and the subsequent purchasers of town lots under them, have, by solemn compact, an undoubted fight to the free use of the land in question forever: for this Compact ought to receive as liberal and beneficial a construction, in behoof of the purchasers, as the site, for a commercial town, and other circumstances, can admit of; because they promptly paid, for the premises, the full stipulated price, affixed by the vendor himself, thus avowedly and publicly bought and sold for that individual purpose.
I should not have taken-notice of the small consideration the father of the appellant paid for the land in litigation, had not one of his counsel repeatedly asserted, With great emphas's, that it was worth half a million of dollars ; but from what motive, or with what view, those assertions were m.de, we have yet to learn; nor will I. even hazard a conjecture on the subject, lest I be mistaken : but, be it as it may, and admitting them to be correct, or, that the land be worth double the-sum stated, the counsel knows, or ought to know, that its value cannot, in the smallest degree, influence the decision of the cause; for, whether it be worth a dollar only, or a million of pounds, the rights of the parties are the game ; and the Court will judge of them without regard ‡0 the value of the subject in litigation.
It was asked, too with exultation, as a question unanswerable, sl if the slip of Iapd in dispute be decided to *413 belong to the town, how the inhabitants thereof could pass through it, from the upper streets to the river, ¡ü a direct course, without committing a trespass on the proprietor of the canal P’ It was an inauspicious question on the part ol the que\lot j as it seemed an effort of a desponding advocate, to puzzle and raise riiSiculiiea In a tottering cause, unsustainable on rational grounds, lather than to define and enlighten one that might be supported on just and equitable principles; and tended more to strengthen than impair the cquUy of the appellee, had aid thereto been wanting. The answer to the question, however, is prompt and easy; to wit, 41 Ly erecting bridges across the canal, at such places as the inhabitants may think convenient, leading from any street in the town directly to the river; taking care not to obstruct the passage of the water to the mill, nor otherwise to injure the can;J.”
The bridges erected may be such as that now standing across the canal, on the public road, leading from the main street of the town, to the bridge on the river, and to Coutt’s ferry-landing below the town, which would be no detriment to the canal. That this position is reasonable and just, will appear evident, by considering the purposes for which the canal was made, and why the use of is became an item in the great prize of the lottery, of which the appellant is, by purchase, now the proprietor.
It was obviously to convey water, from the river above, to the forge and mill; and, therefore, the use of it was, of necessity, made a part of the capital prize. The mill has been rebuilt, and is now in useful operation. The ten feet of ground annexed to the canal, on each side thereof, was, principally, to furnish earth and stone to repair breaches that might be made therein, by tempests. floods in the river, or other accidents, several of which have happened within my observation, and by those means have been repaired. The same ground may serve also for other purposes, at the discretion of the proprietor ; Providedi, direct passages, from the greets *414 to the river, be not thereby obstructed j for, although, on general principles, the grant of the use of a thing, without a qualification, may be construed a grant of the thing itself 5 yet the use may be so modified and approp,-¡ate(jj as admit of a different interpretation ; and such, I conceive, the case before us admits of, and requires. For instance, the use of the landing was included in the first prize of the lottery 5 evidently, for the convenience of shipping iron, flour, &c from the forge and mill, and for receiving necessaries by water, which -cannot be construed into an'absolute grant of the land» ing itself, to. the exclusion of all others ; so, with respect to the canal. the use only of which, as appurtenant to the forge and mill, was held out to the public by the scheme of the lottery ; and equity will construe it such ja use as fully to answer the purposes intended, without prejudice to others ; thus may it be useful to both parties, without injury to either, and the original object and intention of the framer of the lottery be fulfilled 5 for that was the foundation of the claims of the parties on both sides, and the appellant can claim no better right than was vested in Harry Morse, the fortunate adventurer who drew the capital prize in the lottery.
It cannot be fairly presumed that the inhabitants will wantonly erect bridges across the canal, at heavy expenses, where they are not necessary, merely to vex the adverse party ; but in progress of time, and future improvements of the town, several may be found convenient and requisite ; and such, in my apprehension, they will have an undoubted right to erect.
By the act of Assembly, “ to enlarge th.e powers of the trustees of the town of Manchester f passed in the year 1778, it is (among other things) enacted, “ that all stuns of money to be recovered by this act, s- all be applied, by the trustees, towards repairing the streets 0» the said town, or erecting wharfs, and improving the public landings within the same.”
*415 St is not contended, however, that this act strengthened the rights of the inhabitants to the land in controversy ; but it shows the great attention the legislature paid to the improvements of the town in its infant state ; and their sense and understanding to have been, (perfectly coincident with my own,) that the purchasers had previously acquired the right to public landings, to erect wharves, and to every convenience the river, parallel with the town, call afford j which several rights, in my conception, were vested in them by fair purchase from the proprietor, for a valuable considera?ion, many years prior to the sale of the premises to Bdr. Mayo; otherwise* 'where are the conveniences to the river, the public landings, and other advantages, from an extensive commerce with the western country, ostentatiously held out to the public, and promised in the scheme of the lottery, to be found ? Are they on the back lots of the town, half a mile from the river; at the toll house of the bridge, on an island, or, in the macn ¶
That a large commercial «.own, on a navigable river, which was contemplated and calculated to endure fait ages, and is now daily improving in wealth and population, should be laid off, and established by law, under a solemn promise ©f the proprietor of the soil, held out w the public, of every convenience the river could afford, to induce our citizens to become purchasers cf lots, and inhabitants of the town, and the purchases, by solemn sompact being made, that the proprietors and inhabitants are to be forever excluded from the free use and. Irene fit of the river, is, in ray conception, a position an preposterous, and such a solecism in jurisprudence, ar, sot to require a serious refute lion.
The appellant claims all the land between the riviV and the canal, parallel with the town ; and should hr. succeed in his demand, and himself, or his successors, a?;, a future day, through interest or caprice, erect a wall, or dig a ditch along the margin of «he river, the inhabit»*??" *416 Could not even water their horses, but by going without the limits of the town.
On mature consideration of the cause, it seems, to me, that the proprietors of lots in the town of Manchester„ and the inhabitants thereof, are, by fair purchase, well entitled to every convenience of public landings, wharves, navigation of the river, &c. appertaining to the slip of land in controversy, which the late Colonel Byrd, as proprietor thereof, might have used and enjoyed prior to the publication of the scheme of his lottery, and that, by the after sale of the prem ses to Mr. Playo, he committed a fn.ud on the adventurers therein, and those who have purchased under them.
But yet there appears a material error in the decree, which gives to the appellee not only the slip of land irr Controversy, but also the canal aucl its appendages, the' free use of which, with ten feet of land on each side thereof, under the restrictions before mentioned, unquestionably belongs to the appellant, as appurtenant to thé mill, of which, it appears, he is the lawful proprietor. I am, therefore, of opinion, that so much of the decree as gives to the appellee, for the use of the town, the canal, and ten feet of land on each side thereof, ought to be reversed, and the residue of the said decree affirmed.
The following was entered as the Court’s opinion.
44 The Court is of opinion, that the said decree is erroneous, in having therein ordered, 4 that the defendant, John Mayo, do release a't his estate, right, title, and interest, in the land in the bill mentioned, to the plaintiff* and his successors, trustees of the town of Manchester * for the use .of the said town therefore, it is decreed ánd ordered, that the same be reversed and annulled, and that the appellee pay to the appellant his costs, by him expended in the prosecution of his appeal aforesaid here. And this Court proceeding, &c. it is further decreed and ordered, that the appellant do release to the appellee aryl his successors, trustees of the town of .Manvliestrr., *417 for the use of the proprietors and inhabitants of the said town, for the time being, all his estate, right, title, and interest in the slip of land in the proceedings mentioned, lying between the river and the canal, also in the proceedings mentioned, except ten feet of land adjoining the same, on the north east side, and the whole length thereof, as annexed to the said canal; that the proprietors and inhabitants of the said town, for the time being, be forever quieted in the possession thereof; and that the appellant pay to the appellee his costs, by him about his suit in the said Court of chancery expended.” .

 1 Atk. 290. 2 Atk. 111. 2 Eq. Cases Abr. 165. pl. 5.

 2 Atk. 139.

 1 Munf 303. 2 Eq. Cases, 632. 1 Wash. 41.

 1 Wash. 28.

 Note by Judge Roane. Sm'ee this opinion was delivered, Ihave seen,, in the Journals of the House of Delegates, on the I4th of November, \776, a petition was presented by the trustees of the town of Manchester, asserting the title now set up to the premises in question, and praying that an act might pass, move effectually to enable them to remove obstructions placed thereon. This petition wasrejected on the 12th of December of the same year, on the ground, “ that the matter thereof was cognizable before a Court of law.’’ It further appears, hy the same Journals, that, at this time, the elder Mr. Mayo was a delegate for the county of Chesterfield, in which the said town lies. He, therefore, undoubtedly, had notice of the appellee's claim as early as the date aforesaid; and hence it was, that that claim was never contested By him in his lifetime'.

 Page 775-6., of the 7th London edit. with Williams's additons.

 Wyatt's Pr. Reg. 304.

 2 Atk. 139.